# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>1411 K Street N.W. Suite 1300<br>Washington, D.C. 20005,<br><br>COMITÉ DIALOGO AMBIENTAL, INC.,<br>Urb. Evelymar 914 Calle Pino<br>Salinas, Puerto Rico 00751,<br><br>HEALTHY GULF,<br>935 Gravier St. #700<br>New Orleans, Louisiana 70112,<br><br>NEW YORK COMMUNITIES FOR CHANGE,<br>470 Vanderbilt Ave. 9th Fl.<br>Brooklyn, New York 11238,<br><br>and<br><br>THE VESSEL PROJECT OF LOUISIANA<br>2120 Hodges St.<br>Lake Charles, Louisiana 70601,<br><br>       Plaintiffs,<br>  v.<br><br>DEANNE CRISWELL, Administrator,<br>Federal Emergency Management Agency<br>500 C St., S.W.<br>Washington, D.C., 20472,<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br>500 C St. S.W.<br>Washington, D.C. 20024,<br><br>and<br><br>DEPARTMENT OF HOMELAND SECURITY,<br>2707 Martin Luther King Jr Ave S.E.<br>Washington, D.C. 20528,<br><br>       Defendants. | Civil Action No.: _____ |

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# INTRODUCTION

1. This case challenges the Federal Emergency Management Agency's ("FEMA") failure to undertake a Congressionally mandated rulemaking to define the terms "resilient" and "resiliency," as expressly required in the 2018 Disaster Recovery Reform Act ("DRRA"). 115 Pub. L. 254 § 1235(d) (enacted Oct. 5, 2018).

2. Given the ever-increasing number of calamities occurring across the country as a result of the climate emergency, it is vital that FEMA—the Nation's leading disaster preparedness and recovery agency—address these disasters and their cause. By properly defining what it means to build back communities so that they can both thrive in the face of climate chaos, and at the same time mitigate instead of exacerbate the fossil fuel emissions driving climate change, FEMA has an opportunity to play a vital role in the urgent renewable energy transition.

3. In the 2018 DRRA, Congress directed FEMA to define "resiliency" and "resilient" "[n]ot later than" April 5, 2020. More than four years later, FEMA has yet to do so.

4. As recently as one year ago, the Appropriations Committee of the House of Representatives published a Report noting that FEMA "has yet to initiate a rulemaking to define these terms," and explaining that "the lack of a clear definition has limited FEMA's ability to fully realize [the] DRRA's intent of enabling stronger recovery from future disasters."

5. Even more recently, in February, 2024, Plaintiff Center for Biological Diversity sent the FEMA Administrator a letter urging the agency to finally comply with this long-overdue Congressional mandate. FEMA has not responded.

6. Accordingly, Plaintiffs brings this action pursuant to the Administrative Procedure Act ("APA"), which directs that a reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs seeks a Court Order directing FEMA to finally define these terms, as Congress in the DRRA directed the agency do more than four years ago.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 701, *et seq.*

8. This Court may grant the relief requested under the APA, 5 U.S.C. §§ 701-706; and the Declaratory Judgment Act. 28 U.S.C. §§ 2201 and 2202.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events and omissions giving rise to this suit occurred in this district.

## PARTIES

10. Plaintiff Center for Biological Diversity ("Center") is a national, non-profit conservation organization with offices throughout the United States, including Washington, D.C. The Center has more than 1.7 million members and online activists, many of whom care about the country's urgent need to expedite the renewable energy transition and protect human health, the natural environment, and species from the ravages of the climate emergency and environmental degradation. The mission of the Center's Energy Justice Program is to advance environmental justice, energy justice, and community climate resilience in the renewable energy space through public education, campaigning, and other advocacy.

11. The Center's Energy Justice Program has been working for years to improve and better understand how FEMA is addressing the climate emergency, including the extent to which

FEMA is forcing marginalized communities to keep relying on the very fossil fuel infrastructure fueling climate change and toxic pollution. For example, the Center has submitted multiple Freedom of Information Act ("FOIA") requests to FEMA to learn how the agency is approaching its resilience work. The Center has also commented on FEMA environmental review documents under the National Environmental Policy Act ("NEPA") concerning these matters. Similarly, in July 2021 the Center submitted extensive comments in response to FEMA's Request for Information concerning how the agency should comply with recent Executive Orders on the climate emergency and equity.

12. The Center and the other Plaintiffs in this suit have also submitted a Rulemaking Petition to FEMA proposing new "Energy Justice Priorities" that would prioritize distributed renewable energy, energy demand reductions, and electrification in all FEMA funding for energy needs, providing communities with the kinds of resiliency the climate emergency demands. The Petition details how FEMA currently focuses assistance related to energy needs on fossil fuel infrastructure, and proposes definitions of "resiliency" and "resilient" under which FEMA would instead focus FEMA funding used to meet energy needs on distributed renewable energy like rooftop and community-based solar, weatherization and energy efficiency initiatives, and beneficial electrification options such as heat pumps, electric stoves and electric vehicle charging.

13. The Center's Energy Justice program also spends substantial time and resources educating the public concerning the importance of distributed renewable energy in combatting climate change, as well as the opportunities that would be presented by FEMA devoting its substantial resources to distributed energy rather than false fossil fuel energy solutions. This

work has included opinion pieces, reports, outreach to government officials, and other advocacy.[1]

14. FEMA's refusal to complete a rulemaking defining the terms "resiliency" and "resilient" frustrates and impairs the Center Energy Justice Program's mission and work because it forces the Center to divert the organization's resources in order to both try to learn what FEMA is doing, and to seek changes in agency policy. If FEMA were to properly define these terms, the Center would have to spend fewer resources on these matters, thereby redressing the Center's injuries.

15. Plaintiff Comité Dialogo Ambiental, Inc. ("CDA") is a nonprofit community environmental corporation composed of residents of the Municipality of Salinas and the Guayama Region of Puerto Rico. Since 1997, CDA has worked to protect and restore the environment of the communities it serves and to promote conditions under which human beings and the environment can exist in harmony to fulfill economic, social, and other needs of present and future generations.

16. To further its mission, CDA engages in education and community organizing around the adverse impacts of human activities on the ecological balance of natural systems. This includes the harms from substantial fossil fuel energy infrastructure, including centralized transmission and distribution systems, in and near the communities of its members.

17. For example, there is a fossil fuel-fired thermoelectric plant in Salinas and a coal plant in Guayama. These fossil fuel power plants release enormous amounts of toxic pollutants

---

[1] *See, e.g.,* Center Op-Ed, *FEMA must protect the hardest-Hit communities from climate change*, The Hill, Sept. 9, 2021; Center for Biol. Div., *Rooftop Solar Justice* (Mar. 2023); Ctr. for Biol. Div., *The Climate President's Emergency Powers* (Feb. 2022), available at: https://thehill.com/opinion/energy-environment/571334-fema-must-protect-the-hardest-hit-communities-from-climate-change/; https://www.biologicaldiversity.org/programs/energy-justice/pdfs/Rooftop-Solar-Justice-Report-March-2023.pdf; https://www.biologicaldiversity.org/programs/energy-justice/pdfs/Climate-Emergency-Powers-Report.pdf

into the environment, which harm CDA members and their families. Compared to other parts of Puerto Rico, people in Salinas and Guayama are more likely to suffer from cancer, respiratory issues, increased rates of miscarriage, and other health problems.

18. CDA and its members are also harmed by frequent power outages and reliability issues. CDA has been forced to suspend meetings and cancel activities on multiple occasions due to the loss of power. For instance, after Hurricane Fiona, the community lost power for three days and CDA was forced to halt activities at a critical time.

19. CDA members live in communities where FEMA is active, including areas where FEMA has been funding the reconstruction of the fossil fuel grid rather than distributed renewable energy alternatives.

20. FEMA's failure to take action on resiliency as mandated by Congress harms CDA's mission because it makes it more difficult for CDA to understand FEMA's priorities, and to allow CDA to advocate for the resources that will best serve its members. FEMA's failure to provide true resilience has also contributed to the frequent power outages that make CDA's work more difficult. If FEMA pursues resilience in a manner that promotes reliable, distributed renewable energy and storage, that will allow CDA to better serve its members.

21. FEMA's failure to take action on resilience as mandated by Congress also harms CDA's members directly because they would benefit from FEMA spending more federal resources on distributed renewable energy resources rather than funding the rebuilding of the existing fossil fuel energy system in Puerto Rico after disasters, which is more prone to blackouts and vulnerable to continuing climate disasters. By properly defining resiliency and taking action to bring true resiliency to the communities where CDA members live, FEMA would alleviate these economic and public health injuries of CDA members.

22. Plaintiff Healthy Gulf (formerly Gulf Restoration Network) is a Louisiana nonprofit organization that collaborates with and serves communities who love the Gulf of Mexico by providing the research, communications, and coalition-building tools needed to reverse the long pattern of over exploitation of the Gulf's natural resources. Healthy Gulf's vision is for the Gulf of Mexico to be returned to its former splendor that supports a thriving ecosystem that includes the Gulf's natural resources and, just as importantly, the people, communities, and cultures that depend on those resources. Healthy Gulf has hundreds of individual members throughout the Gulf, and, in strategic partnership with allies, runs campaigns in all five Gulf states to advance issues important to the health of the Gulf.

23. One of Healthy Gulf's campaigns fights to make Gulf communities' infrastructure stronger and more resilient. Since fines from the BP disaster started rolling out, Healthy Gulf has been monitoring and watchdogging how these restoration dollars are being spent to protect not just our environmental resources, but also the people who live, work, and play along the Gulf coast. Similarly, as federal dollars from disasters like hurricanes and COVID-19 have flowed into the Gulf, Healthy Gulf has worked with partners like Taproot Earth, National Audubon Society, National Wildlife Federation, Sierra Club, The Nature Conservancy, and faith-based groups working on affordable housing and utilities to ensure that these funds hasten a just transition to a more sustainable and fair economy for Gulf coast communities.

24. As part of this campaign Healthy Gulf has advocated for FEMA to better serve Gulf communities. For example, in July, 2021, Healthy Gulf submitted comments in response to FEMA's Request for Information concerning how the agency should comply with recent Executive Orders on the climate emergency and equity.

7

25. Healthy Gulf and its members are harmed by the devastating impacts of climate change made worse by fossil fuel emissions. They are also harmed by fossil fuel pollution, as well as frequent power outages and reliability issues.

26. Healthy Gulf members live in communities where FEMA is active, including areas where FEMA has been funding fossil fuel infrastructure rather than distributed renewable energy alternatives.

27. FEMA's failure to take action on resiliency as mandated by Congress harms the Healthy Gulf's mission because it makes it more difficult for Healthy Gulf to understand FEMA's priorities, and to allow Healthy Gulf to advocate for the resources that will best serve its members. If FEMA pursues resilience in a manner that promotes reliable, distributed renewable energy and storage, that will allow Healthy Gulf to better serve its members.

28. FEMA's failure to take action on resilience as mandated by Congress also harms Healthy Gulf's members directly because these members would benefit from FEMA spending more federal resources on distributed renewable energy and energy efficiency rather than funding the rebuilding of the existing fossil fuel energy system after disasters. By properly defining resiliency and taking action to bring true resiliency to the communities where Healthy Gulf's members live, FEMA would alleviate these injuries of Healthy Gulf's members.

29. Plaintiff New York Communities for Change ("NYCC") is a New York nonprofit organization which brings together neighbors for community power to improve lives and communities. NYCC uses direct action, legislative advocacy and community organizing to fight for a safe and healthy New York.

30. NYCC fights for safe, affordable and stable homes and neighborhoods instead of evictions and displacement; a thriving planet to build our communities on free from the fossil

fuel pollution causing the climate emergency; safety from economic exploitation; a social safety net for all; and communities safe from violence, police brutality, incarceration & deportations.

31. For example, NYCC climate leaders have pressured New York City to stop investing public pension funds in fossil fuels, campaigned to pass new laws that will cut back on the amount of pollution created by New York City, worked to pass a city-wide fossil gas ban, and fought against gas power plants and pipelines.

32. NYCC's members live in communities where FEMA is active in New York City, including areas where FEMA has been funding fossil fuel infrastructure rather than distributed renewable energy alternatives.

33. FEMA's failure to take action on resiliency as mandated by Congress harms NYCC's mission because it makes it more difficult for NYCC to understand FEMA's priorities, and to allow NYCC to advocate for the resources that will best serve its members. If FEMA pursues resilience in a manner that promotes reliable, distributed renewable energy and storage, that will allow NYCC to better serve its members.

34. FEMA's failure to take action on resilience as mandated by Congress also harms NYCC members directly because these members would benefit from FEMA spending more federal resources on distributed renewable energy and energy efficiency rather than funding the rebuilding of the existing fossil fuel energy system after disasters. By properly defining resiliency and taking action to bring true resiliency to the communities where NYCC's members live, FEMA would alleviate these injuries of NYCC members.

35. Plaintiff The Vessel Project of Louisiana ("The Vessel Project") is a Louisiana nonprofit grassroots mutual aid, disaster relief, and environmental justice organization founded in Southwest Louisiana in response to several federally declared disasters, including hurricanes

Laura and Delta, winter storm Uri, and the May flood of 2021. The Vessel Project realizes the intersectionality of the challenges that plague BIPOC communities and works holistically to achieve environmental and climate justice, voting rights, and access to housing, energy, clean water, safe fresh produce, and healthcare.

36. After a disaster, The Vessel Project assists the affected with their most immediate needs, including emergency shelter, food, formula, diapers, oxygen tanks, cleaning supplies, and disaster assistance applications. The Vessel Project also provides people with the opportunity to connect with each other by hosting free holiday events, game nights, and community meals.

37. The Vessel Project and its members are harmed by the devastating impacts of climate change made worse by fossil fuel emissions. They are also harmed by fossil fuel pollution, as well as frequent power outages and reliability issues.

38. On April 11, 2024 The Vessel Project's office was seriously damaged by a tornado that touched down on Lake Charles. The Vessel Project has also been forced to suspend meetings and cancel activities at other times due to storms and the loss of power.

39. The Vessel Project's members live in communities where FEMA is active, including areas where FEMA has been funding fossil fuel infrastructure rather than distributed renewable energy alternatives.

40. FEMA's failure to take action on resiliency as mandated by Congress harms the Vessel Project's mission because it makes it more difficult for The Vessel Project to understand FEMA's priorities, and to allow The Vessel Project to advocate for the resources that will best serve its members. FEMA's failure to provide true resilience has also contributed to the frequent power outages that make The Vessel Project's work more difficult. If FEMA pursues resilience

in a manner that promotes reliable, distributed renewable energy and storage, that will allow The Vessel Project to better serve its members.

41. FEMA's failure to take action on resilience as mandated by Congress also harms The Vessel Project's members directly because these members would benefit from FEMA spending more federal resources on distributed renewable energy and energy efficiency rather than funding the rebuilding of the existing fossil fuel energy system after disasters. By properly defining resiliency and taking action to bring true resiliency to the communities where The Vessel Project's members live, FEMA would alleviate these injuries of The Vessel Project's members.

42. Defendant Deanne Criswell is the Administrator of the Federal Emergency Management Agency, a federal agency within the Department of Homeland Security, and is responsible for FEMA's compliance with the Congressional mandate in Section 1235(e) of the 2018 DRRA. 42 U.S. Code § 5172(e)(5).

43. Defendant FEMA is a federal agency within the Department of Homeland Security, and administers the Stafford Act, including the mandates Congress set out in the DRRA.

44. Defendant Department of Homeland Security is the executive branch department responsible for the supervision, management, and control of FEMA's activities and its compliance with applicable laws.

## THE STAFFORD ACT AND THE DISASTER RECOVERY REFORM ACT

45. Pursuant to the Stafford Act, 42 U.S.C. § 5121 *et seq.*, FEMA spends billions of dollars each year to both fund recovery efforts and help communities with emergency planning and hazard mitigation.

46. As a result of the increasing numbers of disasters being caused by the fossil fuel driven climate emergency, in recent decades Congress has continued to expand FEMA's Stafford Act mandates. For example, in the Post-Katrina Emergency Reform Act of 2006, Congress directed FEMA to work to "protect the Nation from all hazards," including "man-made disasters" like climate change. 16 U.S.C. § 313(b)(1).

47. More recently, in response to a series of devastating hurricanes, Congress passed the 2018 Disaster Recovery Reform Act ("DRRA"). 115 Pub. L. 254. The legislative history of the DRRA reflects Congress's directive for FEMA to focus on true "resilience" in order to "help reduce costs and impacts," specifically noting that an important part of that directive includes mandating that FEMA conduct a formal rulemaking for "definition[s] of the terms 'resilient' and 'resiliency.'"

48. Thus, among other requirements, the DRRA provides:

> (d) NEW RULES.—Section 406(e) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5172(e)) is further amended by adding at the end the following:
> "(5) NEW RULES. –
>    "(A) IN GENERAL.—Not later than 18 months after the date of enactment of this paragraph, the President, acting through the Administrator of the Federal Emergency Management Agency, and in consultation with the heads of relevant Federal departments and agencies, *shall issue a final rulemaking that defines the terms 'resilient' and 'resiliency' for purposes of this subsection.*
>    "(B) INTERIM GUIDANCE.—Not later than 60 days after the date of enactment of this paragraph, the Administrator shall issue interim guidance to implement this subsection. Such interim guidance shall expire 18 months after the date of enactment of this paragraph or upon issuance of final regulations pursuant to subparagraph (A), whichever occurs first.

>     ''(C) GUIDANCE.—Not later than 90 days after the date on which the Administrator issues the final rulemaking under this paragraph, the Administrator shall issue any necessary guidance related to the rulemaking.
>     ''(D) REPORT.—Not later than 2 years after the date of enactment of this paragraph, the Administrator shall submit to Congress a report summarizing the regulations and guidance issued pursuant to this paragraph.

115 Pub. L. 254 § 1235(d) (emphasis added).

## FACTUAL BACKGROUND

**A.     FEMA's Failure To Take The Necessary Steps To Address The Climate Emergency.**

49.     The Stafford Act, as amended, directs FEMA to foster true resilience by helping communities both withstand climate chaos and no longer rely on the fossil fuel economy causing climate change. For example, in the 2022 Community Disaster Resilience Zones Act, Public Law 117–255 (Dec. 20, 2022), Congress recently amended the Stafford Act's core list of FEMA's purposes to, for the first time, make it explicit that "it is the intent of the Congress" for FEMA to assist communities by "identifying and improving the climate and natural hazard resilience of vulnerable communities." 42 U.S. Code § 5121(b)(7).

50.     Nonetheless, the bulk of FEMA's expenditures continue to support *status quo*, fossil fuel related infrastructure. This includes deployment of diesel generators; repair of gas furnaces and other fossil fuel heating systems; and rebuilding fossil fuel-based power generation, power lines, and related electricity and pipeline transmission systems.

51.     Across the country, fossil fuel-based infrastructure is disproportionately concentrated in communities of color and low-wealth communities, causing asthma, cancer, and other serious health harms to residents exposed to the pollution these facilities inevitably emit into the air and water. By funding the repair of this fossil fuel-based infrastructure, FEMA is thereby exacerbating, rather than alleviating, the harms these communities face.

52. In December, 2021 FEMA issued a Report entitled *Resources for Climate Resilience*, in which FEMA recognized that the hazards it is charged with addressing are being exacerbated by climate change, and discussed actions FEMA is taking to address these challenges. However, the Report does not mention efforts to transition communities away from fossil fuels—the source driving greater natural disasters—and toward renewable energy alternatives.

53. Around the same time period, FEMA also issued a 2022-2026 Strategic Plan. That Plan similarly fails to address the vital transition away from the fossil fuel economy or the urgency of the rapid transition to renewable energy.

**B.  FEMA's Failure To Comply With the DRRA Mandate To Define Resilience.**

54. A vital part of FEMA bringing true resilience to the communities it serves would be for the agency to finally comply with the Congressional mandate to actually define "resiliency" and "resilient." However, while FEMA has taken some actions concerning resilience since passage of the DRRA, the agency has not conducted the required rulemaking.

55. In 2018, FEMA created "FEMA Resilience," an office through which the agency administers several programs.

56. In 2019, FEMA issued guidance that discussed resilience. However, at that time FEMA explained that, while the DRRA "requires FEMA . . . to issue a final rulemaking by April 5, 2020, to define the terms 'resilient' and 'resiliency,'" the agency was "not using this interim Policy to issue a new definition for the terms 'resilient' or 'resiliency.'"

57. Emails obtained through the Freedom of Information Act ("FOIA") reflect that agency officials have continued to internally discuss the "Resilience Definition," with one official, in 2022, referring to external inquiries as "your regular dose of Resilience déjà vu."

58. In its June, 2023 Report on the 2024 Department of Homeland Security Appropriations Bill, the United States House of Representatives Appropriations Committee reiterated that Congress had mandated that FEMA "issue a final rulemaking by April 5, 2020, to define the terms ''resilient'' and ''resiliency.''" Noting that "[m]ore than three years after this deadline has passed, and nearly five years after the establishment of 'FEMA Resilience,' FEMA has yet to initiate a rulemaking to define these terms," the Committee stated that it is "puzzled by FEMA's inability to define the term around which it has based an entire organization within the agency." The Committee further explained that it is "concerned that a lack of a clear definition has limited FEMA's ability to fully realize DRRA's intent of enabling stronger recovery from future disasters."

59. Internal FEMA documents obtained through the FOIA reflect that FEMA is well aware of the Committee's concern. An internal report from last year noted the Committee's "dismay at FEMA's continued implementation of the Resilience Reorganization despite FEMA's inability to define the terms" as required by the DRRA. In June, 2023, an agency official wrote that they would "do my best to deflect" ongoing questions about this issue, but no actual action appears to have occurred.

C. **Plaintiffs' Effort To Resolve This Matter Without Resorting To Litigation.**

60. In a final effort to resolve this issue, on February 8, 2024 Plaintiffs sent Administrator Criswell a letter noting that FEMA has repeatedly recognized the statutory deadline to define these terms, but that FEMA has still failed to do so. The letter further explained:

> the ever-increasing frequency and severity of climate-fueled disasters urgently requires a new approach to disaster recovery that capitalizes on every opportunity to help communities rebuild with zero-carbon infrastructure that is not only more resilient to future disasters but that simultaneously helps to address the climate

15

crisis itself. That is why it is critical that FEMA finally does as Congress has required and adopts a definition of "resilient" and "resiliency" that incorporates these principles and supports resilient solutions on public facilities.

61. Plaintiffs' letter asked FEMA to "let us know no later than March 1, 2024 when FEMA will issue the required rulemaking," and explained that if FEMA did not respond, Plaintiffs may take further action.

62. As of the date of this filing, FEMA has not responded to this inquiry.

## CLAIM FOR RELIEF

### Failure to Comply With Congressional Deadline

63. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

64. The Disaster Recovery Reform Act ("DRRA"), 115 Pub. L. 254 § 1235(d) (enacted Oct. 5, 2018), mandates that, "[n]ot later than 18 months after the date of enactment of this paragraph" (*i.e.*, April 5, 2020),  "the Administrator of the Federal Emergency Management Agency, and in consultation with the heads of relevant Federal departments and agencies, shall issue a final rulemaking that defines the terms 'resilient' and 'resiliency' for purposes of this subsection." 42 U.S.C. § 5172(e)(5).

65. Defendants have not issued a proposed or final rulemaking defining these terms as required by this statutory provision.

66. Defendants' failure to define these terms as directed by Congress is injuring Plaintiffs and their members in the manner described above.

67. Defendant's failure to define these terms as directed by Congress constitutes agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA. 5 U.S.C. § 706(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests that this Court:

A. Declare that Defendants are violating Section 1235(d) of the DRRA by failing to issue a final rulemaking defining the terms "resiliency" and "resilient," as Congress mandated the agency to do more than four years ago.

B. Order Defendants to promptly initiate a rulemaking, and to issue a proposed and final rule defining the terms "resiliency" and "resilient."

C. Award Plaintiffs their costs and reasonable attorney fees.

D. Grant such other and further relief as the Court may deem just and proper.

DATED: May 2, 2024

        Respectfully submitted,

        */s/ Howard M. Crystal*
        Howard M. Crystal
        (D.C. Bar No. 446189)
        hcrystal@biologicaldiversity.org
        (202) 809-6926

        */s/ Anchun Jean Su*
        Anchun Jean Su
        (D.C. Bar No. CA285167)
        jsu@biologicaldiversity.org
        (585) 503-8765

        CENTER FOR BIOLOGICAL DIVERSITY
        1411 K Street NW, Suite 1300
        Washington, D.C. 20005

        *Attorneys for Plaintiffs*